# Presidential Signing Statements

This testimony discusses the purpose and history of presidential signing statements.

January 31, 2007

STATEMENT BEFORE THE HOUSE COMMITTEE ON THE JUDICIARY

Mr. Chairman, Ranking Member Smith, and Members of the Committee, I appreciate the opportunity to appear here today to discuss the purpose and history of presidential signing statements.

Like most Presidents before him, President Bush occasionally issues statements on signing legislation into law. Presidents have used these "signing statements" for a variety of purposes. At times Presidents use signing statements to explain to the public why the President endorses a bill and what the President understands to be its likely effect. At other times, Presidents use the statements to guide subordinate officers within the Executive Branch in enforcing or administering a particular provision.

Presidents throughout history also have issued what may be called "constitutional" signing statements, and it is this use of the signing statement that has recently been the subject of public attention. Presidents are sworn to "preserve, protect, and defend the Constitution," and thus are responsible for ensuring that the manner in which they enforce acts of Congress is consistent with America's founding document. Presidents have long used signing statements for the purpose of "informing Congress and the public that the Executive believes that a particular provision would be unconstitutional in certain of its applications," *The Legal Significance of Presidential Signing Statements*, 17 Op. O.L.C. 131, 131 (1993) ("*Presidential Signing Statements*"), or for stating that the President will interpret or execute provisions of a law in a manner that would avoid possible constitutional infirmities. As Assistant Attorney General Walter Dellinger noted early during the Clinton Administration, "[s]igning statements have frequently expressed the President's intention to construe or administer a statute in a particular manner (often to save the statute from unconstitutionality)." *Id*. at 132.

President Bush, like many of his predecessors dating back to President James Monroe, has issued constitutional signing statements. The constitutional concerns identified in these statements often pertain to provisions of law that could be read to infringe explicit constitutional provisions (such as the Recommendations Clause, the Presentment Clauses, and the Appointments Clause) or to violate specific constitutional holdings of the Supreme Court. (Common examples are set forth in Part II below.) As such, President Bush's signing statements are indistinguishable from those issued by past Presidents. As the Congressional Research Service concluded in its recent comprehensive study, "it is important to note that the substance of [President Bush's] signing statements do not appear to differ

substantively from those issued by either Presidents Reagan or Clinton." T.J. Halstead, Cong. Research Serv., *Presidential Signing Statements*: *Constitutional and Institutional Implications* at CRS-12 (Sept. 20, 2006); *accord* Curtis A. Bradley & Eric A. Posner, *Signing Statements: It's a President's Right*, Boston Globe, Aug. 3, 2006 ("The constitutional arguments made in President Bush's signing statements are similar—indeed, often almost identical in wording—to those made in Bill Clinton's statements."). In addition, the number of such statements issued by President Bush is in keeping with the number issued by every President during the past quarter century.

It is important to establish at the outset what presidential signing statements are not: an attempt to "cherry-pick" among the parts of a duly enacted law that the President will choose to follow, or an attempt unilaterally to redefine what the law is after its enactment. Presidential signing statements are, rather, a statement by the President explaining his interpretation of and responsibilities under the law, and they are therefore an essential part of the constitutional dialogue between the branches that has been a part of the etiquette of government since the early days of the Republic. Nor are signing statements an attempt to "override" duly enacted laws, as some critics have suggested. Many constitutional signing statements are an attempt to preserve the enduring balance between coordinate branches of government, but this preservation does not mean that the President will not enforce the provision as enacted.

One common example illustrates the natural course by which a President may object to a constitutionally problematic provision without deviating from the text of a statute or failing to abide by its provisions. In the Appointments Clause context discussed below, Congress sometimes attempts to place undue restrictions on the pool from which the President may select appointment candidates. As a mandatory directive to the President, such restrictions violate the Appointments Clause, U.S. Const. art. II, § 2, as each of the past four Presidents has noted in signing statements. If construed as a recommendation from Congress, however, these appointments provisions are constitutional and are often routinely followed. A constitutional signing statement on this issue, therefore, is not a declaration that the President will not follow the appointments provisions, but that he remains free to abide by them as a matter of policy. And it is commonly the case that Presidents do abide by such appointment provisions.

Similarly, a surprising number of newly enacted statutes seek to require the approval of a congressional committee before execution of a law, despite well-settled Supreme Court precedent that such "legislative veto" provisions violate the Presentment and Bicameralism Clauses of the Constitution, art. I, § 7. *See INS v. Chadha*, 462 U.S. 919, 958 (1983). More than 20 years after that clearly controlling Supreme Court decision, unconstitutional legislative veto provisions remain so common that President Bush has had to raise the issue in approximately 55 of his 126 constitutional signing statements. *See, e.g.*, Statement on Signing the

Military Quality of Life and Veterans Affairs Appropriations Act, 41 *Weekly Comp. Pres. Doc.* 1799, 1799 (Nov. 30, 2005) ("The Constitution requires bicameral passage, and presentment to the President, of all congressional actions governing other branches, as the Supreme Court of the United States recognized in *INS v. Chadha* (1983), and thus prohibits conditioning executive branch action on the approval of congressional committees. Many provisions of the Act conflict with this requirement and therefore shall be construed as calling solely for notification, including the following: 'Department of Defense Base Closure Account 2005,' 'Department of Veterans Affairs, Information Technology Systems,' 'Department of Veterans Affairs, Construction, Major Projects,' and sections 128, 129, 130, 201, 211, 216, 225, 226, 227, and 229."); Statement on Signing the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 41 *Weekly Comp. Pres. Doc.* 1701, 1701 (Nov. 10, 2005) ("The executive branch shall construe certain provisions of the Act that purport to require congressional committee approval for the execution of a law as calling solely for notification, as any other construction would be inconsistent with the principles enunciated by the Supreme Court of the United States in *INS v. Chadha*.").

When constitutionally problematic provisions such as these are placed in otherwise constitutional bills, signing statements serve the appropriate function of reminding Congress and members of the Executive Branch of the deficiency. Again, however, President Bush and past Presidents to our knowledge have not ignored these provisions, but have instead done their utmost to apply them in a manner that does not violate the Constitution by ordering Executive Branch officials to notify congressional committees as anticipated by the provisions. *See id*. In short, where a President has no choice but to avoid a constitutional violation, the President's best course is to announce publicly his intention to construe the provision constitutionally. Where the constitutional violation stems not from the substance of a provision but from its mandatory nature, as with the Appointments Clause, the President's best course is to note the deficiency, leaving the President free to act in accordance with the provision as a matter of policy.

In another category of cases, Presidents recognize a statute as constitutional on its face, and anticipate that it will be applied constitutionally, but also foresee that in extreme or unanticipated circumstances it could raise the possibility of an unconstitutional application. An appropriate signing statement may therefore announce that the President fully intends to apply the law as far as possible, consistent with his duty to the Constitution.

The charge that constitutional signing statements are a "power grab" and encroach on Congress's power to write the law is fundamentally flawed. Signing statements do not alter the constitutional balance between the President and Congress. That is established by the Constitution itself, and neither the President nor Congress can alter it through their actions. Signing statements do not expand

the President's authority: The President cannot adopt the provisions he prefers and ignore those he does not; he must execute the law as the Constitution requires. Nor do signing statements diminish congressional power. Congress has no power to enact unconstitutional laws, and that is true whether the President issues a constitutional signing statement or not.

## I.

Signing statements have been an integral part of the constitutional dialogue between the branches of government since the early days of the Republic. After a thorough study, Assistant Attorney General Dellinger concluded that the use of signing statements "to raise and address the legal or constitutional questions . . . presented by" enrolled bills "can be found as early as the Jackson and Tyler Administrations, and later presidents, including Lincoln, Andrew Johnson, Theodore Roosevelt, Wilson, Franklin Roosevelt, Truman, Eisenhower, Lyndon Johnson, Nixon, Ford and Carter, also engaged in the practice." *Presidential Signing Statements*, 17 Op. O.L.C. at 138. Even as early as 1822, President James Monroe issued a signing statement in which he stated that he would construe a statutory provision in a manner that did not conflict with his prerogative to appoint officers. Letter to the Senate of the United States (Apr. 13, 1822), *in* 2 *A Compilation of the Messages and Papers of the Presidents* 698 (James D. Richardson ed., 1897). In 1830, Andrew Jackson "signed a bill and simultaneously sent to Congress a message" setting forth his interpretation "that restricted the reach of the statute." *Presidential Signing Statements*, 17 Op. O.L.C. at 138 (quoting Louis Fisher, *Constitutional Conflicts between Congress and the President* 128 (3d ed. 1991)).

The use of the constitutional signing statement has become more common in recent presidencies, beginning with President Reagan. While the task of counting constitutional signing statements is inexact because of the difficulty of characterizing such statements, Presidents Reagan, George H.W. Bush, Clinton, and George W. Bush have apparently issued constitutional signing statements with respect to similar numbers of laws. By our count, President Reagan issued constitutional signing statements with respect to 80 laws; George H.W. Bush, 114; Clinton, 80. The numbers in the academic literature are comparable or even higher. By our count, President Bush has issued constitutional signing statements with respect to 126 bills as of January 25 of this year. Some Presidents have in the past used signing statements simply to praise a piece of legislation, and even including non-constitutional signing statements, the total number of signing statements is only a small fraction of the number of laws passed by Congress. For example, President Bush issued a total of 28 signing statements for both bills and joint resolutions in 2003, 25 in 2004, 14 in 2005, 23 in 2006, and 1 thus far this year, totaling only approximately 9 percent of the 498 public laws passed by the 108th Congress and the 482 public laws passed by the 109th Congress.

This practice of issuing signing statements does not mean that a President has acted contrary to law or the Legislative Branch. The practice is consistent with, and derives from, the President's constitutional obligations, and is an ordinary part of a respectful constitutional dialogue between the branches. When Congress passes legislation containing provisions that could be construed or applied in certain cases in a manner contrary to well-settled constitutional principles, the President can and should take steps to ensure that such laws are interpreted and executed in a manner consistent with the Constitution. The Supreme Court specifically has stated that the President has the power to "supervise and guide [Executive officers'] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone," *Myers v. United States*, 272 U.S. 52, 135 (1926); *see also Bowsher v. Synar*, 478 U.S. 714, 733 (1986) ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law.").

The President takes an oath to "preserve, protect and defend the Constitution of the United States." U.S. Const. art. II, § 1, cl. 8. The President has the responsibility and duty also to faithfully execute the laws of the United States. U.S. Const. art. II, § 3. But these duties are not in conflict: the law the President must execute includes the Constitution—the supreme law of the land. Because the Constitution is supreme over all other law, the President must resolve any conflict between statutory law and the Constitution in favor of the Constitution, just as courts must.

This presidential responsibility may arise most sharply when the President is charged with executing a statute, passed by a previous congress and signed by a prior President, a provision of which he finds unconstitutional under intervening Supreme Court precedent. A President that places the statutory law over the constitutional law in this instance would fail in his duty faithfully to execute the laws. The principle is equally sound where the Supreme Court has yet to rule on an issue, but the President has determined that a statutory law violates the Constitution. To say that the principle is not equally sound in this context is to deny the President's independent responsibility to interpret and uphold the Constitution. It is to leave the defense of the Constitution only to two, not three, of the branches of our government. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990) ("The Members of the Executive and Legislative Branches are sworn to uphold the Constitution, and they presumably desire to follow its commands."); *Webster v. Doe*, 486 U.S. 592, 613 (1988) (Scalia, J., dissenting) ("Members of Congress and the supervising officers of the Executive Branch take the same oath to uphold the Constitution that we do . . . .").

In the past year alone, many prominent commentators, including respected scholars and former officials of the Clinton Administration's Justice Department, have said that the use of signing statements is a legitimate presidential power. For

example, Professors Tribe, Bradley, and Posner have acknowledged the appropriateness of constitutional signing statements. *See* Laurence H. Tribe, *"Signing statements" are a phantom target*, Boston Globe, Aug. 9, 2006; Curtis A. Bradley & Eric A. Posner, *Signing Statements: It's a President's Right*, Boston Globe, Aug. 3, 2006; Curtis A. Bradley & Eric A. Posner, *Presidential Signing Statements and Executive Power*, Const. Commentary (forthcoming). Professor Dellinger has done the same, reiterating the views that he expressed as Assistant Attorney General during the Clinton Administration (and that I have quoted above). Walter Dellinger, *A Slip of the Pen*, N.Y. Times, July 31, 2006. And the Congressional Research Service concluded that "in analyzing the constitutional basis for, and legal effect of, presidential signing statements, it becomes apparent that no constitutional or legal deficiencies adhere to the issuance of such statements in and of themselves." *Presidential Signing Statements*: *Constitutional and Institutional Implications* at CRS-1. These analyses by commentators who span the ideological spectrum represent the mainstream opinion among informed constitutional scholars.

I am aware that the American Bar Association issued a report last year that reached a contrary conclusion. *See* American Bar Association, *Report of the Task Force on Presidential Signing Statements and the Separation of Powers Doctrine* (Aug. 2006). We respectfully disagree with the analysis in that report, which suggests that a President has no choice but to enforce a clearly unconstitutional provision of law until the provision is struck down by a court, and that a President has no choice but to veto a bill if even a minor provision of an omnibus bill violates the Constitution in some applications. As noted, scholars of many different viewpoints share our disagreement with the report's constitutional analysis.

To be sure, people may fairly disagree with the language in particular signing statements, because there is honest disagreement in many instances about what the Constitution requires. But as this testimony will reveal, President Bush's signing statements are of a piece with prior administrations' signing statements. He is exercising a legitimate power in a legitimate way.

To appreciate the value of signing statements, consider the alternatives. As we understand the argument, some critics of presidential signing statements would prefer that a President either reject the legislation outright through veto or remain silent upon signing the legislation. First, it has never been the case that the President's only option when confronting a bill containing a provision that is constitutionally problematic is to veto the bill. Presidents Jefferson (e.g., the Louisiana Purchase), Lincoln, Theodore Roosevelt, Wilson, Franklin Roosevelt, Truman, Eisenhower, Kennedy, Lyndon Johnson, Ford, Carter, as well as George H.W. Bush and Clinton, have signed legislation rather than vetoing it despite concerns that particular aspects of the legislation posed constitutional difficulties. *See Presidential Signing Statements*, 17 Op. O.L.C. at 132 nn. 3 & 5, 134, 138; *see*

*also Chadha*, 462 U.S. at 942 n.13 ("it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds"). Assistant Attorney General Dellinger explained early during the Clinton Administration: "In light of our constitutional history, we do not believe that the President is under any duty to veto legislation containing a constitutionally infirm provision." *Presidential Signing Statements*, 17 Op. O.L.C. at 135. To be sure, Presidents have the option of vetoing a bill most of whose provisions are clearly constitutional but that contains a few provisions that may be read to permit certain unconstitutional applications. It is more sensible, however, to sign the bill while giving the problematic provisions a "saving" construction. Respect for the Legislative Branch in this circumstance is not shown by the veto of an otherwise well crafted bill, but by a candid and public signing statement. Compared to vetoing a bill, giving constitutionally infirm provisions a "saving" interpretation through a signing statement gives fuller effect to the wishes of Congress by giving complete effect to the great bulk of a law's provisions and the fullest possible effect to even constitutionally problematic provisions. This approach is not an affront to Congress. Instead, it gives effect to the well-established legal presumption that Congress did not choose to enact an unconstitutional provision. As Assistant Attorney General Dellinger explained, this practice is "analogous to the Supreme Court's practice of construing statutes, where possible, to avoid holding them unconstitutional." *Presidential Signing Statements*, 17 Op. O.L.C. at 133. A veto, by comparison, would render all of Congress's work a nullity, even if, as is often the case, the constitutional concerns involve relatively minor provisions of major legislation. The value of this ability to preserve legislation has grown in step with the use of large omnibus bills in the last few decades.

It should also be noted that a veto may only delay, not avoid, the constitutional question. If a President's veto is overridden by Congress, the resulting statute still must be interpreted and executed by that and future Presidents in keeping with the Constitution. To return to the example of a *Chadha* violation, where a provision attempts to condition future executive action on the approval of a congressional committee, the President and the courts, including the Supreme Court, will still be compelled to find that provision unconstitutional, and therefore unenforceable. Moreover, this was true even before the definitive Supreme Court ruling in *Chadha. See, e.g., Chadha*, 462 U.S. at 942 n.13 (citations omitted) ("11 Presidents, from Mr. Wilson through Mr. Reagan, who have been presented with this issue have gone on record at some point to challenge congressional vetoes as unconstitutional.").

As for the second suggested alternative to signing statements—presidential silence—it is not clear what critics of signing statements hope will be gained by such a course. Signing statements have the virtue of making the President's views public. A statement may notify the Congress and the American people of concerns that the President has about the legislation and how the Executive Branch will construe a particular law. Or it may serve only as a reminder to those in the

Executive Branch charged with executing a law that the law must be applied within the confines of the Constitution. Neither Congress nor the public would be better served by such statements being restricted to an internal Executive Branch audience. Employing signing statements to advise Congress of constitutional objections is more respectful of Congress's role as an equal branch of government than public silence, and promotes a constitutional dialogue that is healthy in a democracy.

The last possible alternative—for the President to remain publicly silent *and* not to direct subordinate Executive Branch officials to construe the law in a constitutional manner—would flatly contradict the Constitution's requirement that the President "take care that the Laws [are] faithfully executed." Recent administrations, including the Reagan, George H.W. Bush, and Clinton Administrations, consistently have taken the position that "the Constitution provides [the President] with the authority to decline to enforce a clearly unconstitutional law." *Presidential Signing Statements*, 17 Op. O.L.C. at 133 (opinion of Assistant Attorney General Dellinger) (noting that understanding is "consistent with the view of the Framers" and has been endorsed by many members of the Supreme Court). Indeed, "every President since Eisenhower has issued signing statements in which he stated that he would refuse to execute unconstitutional provisions." *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 202 (1994) (opinion of Assistant Attorney General Dellinger); *see also id.* at 199 (noting that "consistent and substantial executive practice" since "at least 1860 assert[s] the President's authority to decline to effectuate enactments that the President views as unconstitutional"); *Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation*, 4A Op. O.L.C. 55, 59 (1980) (opinion of Benjamin R. Civiletti, Attorney General to President Carter) ("the President's constitutional duty does not require him to execute unconstitutional statutes"); 2 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 446 (2d ed. 1836) (statement of James Wilson, signer of Constitution from Pennsylvania) (noting that, just as judges have a duty "to pronounce [an unconstitutional law] *void* . . . [,] [i]n the same manner, the President of the United States could . . . refuse to carry into effect an act that *violates* the Constitution"). Rather than tacitly placing limitations on the enforcement of provisions (or declining to enforce them), as has been done in the past, signing statements promote a constitutional dialogue with Congress by openly stating the interpretation that the President will give certain provisions.

Finally, some have raised the concern that courts will use signing statements to interpret statutes in contravention of the legislative goal. Signing statements, of course, are not binding on the courts; they are principally an exercise of the President's responsibility as head of the Executive Branch to determine the correct interpretation of the law for purposes of executing it faithfully. There must be an authoritative interpretation of the law within the Executive Branch, and it is the

President's responsibility as Chief Executive to ensure that the law is authoritatively interpreted consistent with the Constitution.

## II.

Many of President Bush's constitutional signing statements have sought to preserve three specific constitutional provisions that are sometimes overlooked in the legislative process: the Recommendations Clause, the Presentment Clauses, and the Appointments Clause. Far from using signing statements in "unprecedented fashion," as some critics have contended, this President has employed constitutional signing statements in a way completely consistent with those of his predecessors. Three additional important areas that have elicited comment from Presidents are the protection of confidential national security information, the preservation of the Executive's foreign affairs power and position as Commander in Chief, and the preservation of the President's status as head of a unitary Executive Branch.

### A. Recommendations Clause

Presidents commonly have raised concern when Congress purports to *require* the President to submit legislative recommendations, because the Constitution vests the President with discretion to do so when he sees fit, stating that he "shall from time to time . . . recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient." U.S. Const. art. II, § 3, cl. 1. By our count, President Bush raised this particular concern in approximately 67 of his 126 constitutional signing statements. President Bush's statements on this point, moreover, are indistinguishable from President Clinton's. *Compare, e.g.*, Statement on Signing the Intelligence Authorization Act for Fiscal Year 2005, 40 *Weekly Comp. Pres. Doc.* 3012, 3012 (Dec. 23, 2004) (President Bush) ("To the extent that provisions of the Act, such as sections 614 and 615, purport to require or regulate submission by executive branch officials of legislative recommendations to the Congress, the executive branch shall construe such provisions in a manner consistent with the President's constitutional authority to supervise the unitary executive branch and to submit for congressional consideration such measures as the President judges necessary and expedient."), *with, e.g.*, Statement on Signing the Shark Finning Prohibition Act (Dec. 26, 2000), 3 *Pub. Papers of Pres. William J. Clinton* 2782, 2782 (2000–2001) ("Because the Constitution preserves to the President the authority to decide whether and when the executive branch should recommend new legislation, Congress may not require the President or his subordinates to present such recommendations (section 6). I therefore direct executive branch officials to carry out these provisions in a manner that is consistent with the President's constitutional responsibilities."). *See also* Statement on Signing the Balanced Budget Act of 1997 (Aug. 5, 1997), 2 *Pub. Papers*

*of Pres. William J. Clinton* 1053, 1054 (1997) ("Section 4422 of the bill purports to require the Secretary of Health and Human Services to develop a legislative proposal . . . . I will construe this provision in light of my constitutional duty and authority to recommend to the Congress such legislative measures as I judge necessary and expedient, and *to supervise and guide my subordinates, including the review of their proposed communications to the Congress*.") (emphasis added); Statement on Signing the Treasury and General Government Appropriations Act (Oct. 10, 1997), 2 *Pub. Papers of Pres. William J. Clinton* 1339, 1340 (1997) ("Any broader interpretation of the provision that would apply to 'nonwhistle-blowers' would *raise substantial constitutional concerns in depriving the President and his department and agency heads of their ability to supervise and control the operations and communications of the executive branch. I do not interpret this provision to detract from my constitutional <i>authority in this way</i>*.") (emphasis added).

## B. Presentment Clauses/Bicameralism/*INS v. Chadha*

Presidents commonly raise concern when Congress purports to authorize a single house of Congress to take action on a matter in violation of the well-established rule, embodied in the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919, 958 (1983), that Congress can act only by "passage by a majority of both Houses and presentment to the President." U.S. Const. art. I, § 7 (requiring that bills and resolutions pass both houses before being presented to the President). By our count, President Bush raised this particular concern in 55 of his 126 constitutional signing statements. Again, President Bush followed in the footsteps of prior Presidents, including President Clinton, in raising this concern in various signing statements. *Compare, e.g.*, Statement on Signing the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 41 *Weekly Comp. Pres. Doc.* 1920, 1920 (Dec. 30, 2005) ("The executive branch shall construe certain provisions of the Act that purport to require congressional committee approval for the execution of a law as calling solely for notification, as any other construction would be inconsistent with the constitutional principles enunciated by the Supreme Court of the United States in *INS v. Chadha*."), *with, e.g.*, Statement on Signing the Consolidated Appropriations Act, FY 2001 (Dec. 21, 2000), 3 *Pub. Papers of Pres. William J. Clinton* 2770, 2776 (2000–2001) ("There are provisions in the Act that purport to condition my authority or that of certain officers to use funds appropriated by the Act on the approval of congressional committees. My Administration will interpret such provisions to require notification only, since any other interpretation would contradict the Supreme Court ruling in *INS v. Chadha*.").

## C. Appointments Clause

The Appointments Clause of the Constitution, U.S. Const. art. II, § 2, provides that the President, with the advice and consent of the Senate, shall appoint principal officers of the United States (heads of agencies, for example); and that "inferior officers" can be appointed only by the President, by the heads of "Departments" (agencies), or by the courts. Presidents commonly raise a concern when bills seem to restrict the President's ability to appoint officers, or to vest entities other than those specified in the Constitution with the power to appoint officers. By our count, President Bush raised this concern in 25 of his 126 constitutional signing statements. President Bush's signing statements on this point are nearly identical to President Clinton's. *Compare, e.g.*, Statement on Signing the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, 41 *Weekly Comp. Pres. Doc.* 1273, 1273 (Aug. 10, 2005) (President Bush) ("The executive branch shall construe the described qualifications and lists of nominees under section 4305(b) as recommendations only, consistent with the provisions of the Appointments Clause of the Constitution."), *with, e.g.*, Statement on Signing the Gramm-Leach-Bliley Act (Nov. 12, 1999), 2 *Pub. Papers of Pres. William J. Clinton* 2082, 2084 (1999) ("Under section 332(b)(1) of the bill, the President would be required to make such appointments from lists of candidates recommended by the National Association of Insurance Commissioners. The Appointments Clause, however, does not permit such restrictions to be imposed upon the President's power of appointment. I therefore do not interpret the restrictions of section 332(b)(1) as binding and will regard any such lists of recommended candidates as advisory only.").

## D. Confidentiality of National Security Information

The Supreme Court has held that the Constitution gives the President authority to control the access of Executive Branch officials to classified information. The Supreme Court has stated that the President's "authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from this constitutional investment of power in the President and *exists quite apart from any explicit congressional grant*." *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). Presidents commonly have issued signing statements when newly enacted provisions might be construed to involve the disclosure of sensitive information. *See, e.g.*, Statement by the President Upon Approval of Bill Amending the Naval Security Act of 1954 (July 24, 1959), *Pub. Papers of Pres. Dwight D. Eisenhower* 549, 549 (1959) ("I have signed this bill on the express premise that the three amendments relating to disclosure are not intended to alter and cannot alter the recognized Constitutional duty and power of the Executive with respect to the

disclosure of information, documents, and other materials. Indeed, any other construction of these amendments would raise grave Constitutional questions under the historic Separation of Powers Doctrine.").

By our count, President Bush raised this concern in approximately 63 of his 126 constitutional signing statements. President Bush's statements regarding this issue are nearly identical to the statements issued by past Presidents, including Presidents Eisenhower and Clinton. *Compare, e.g.*, Statement on Signing Legislation on Amendments to the Mexico-United States Agreement on the Border Environment Cooperation Commission and the North American Development Bank, 40 *Weekly Comp. Pres. Doc.* 550, 550–51 (Apr. 5, 2004) (President Bush) ("Sections 2(5) and 2(6) of the Act purport to require the annual report of the Secretary of the Treasury to include a description of discussions between the United States and Mexican governments. In order to avoid intrusion into the President's negotiating authority and ability to maintain the confidentiality of diplomatic negotiations, the executive branch will not interpret this provision to require the disclosure of either the contents of diplomatic communications or specific plans for particular negotiations in the future."), *with, e.g.*, Statement on Signing the National Defense Authorization Act for Fiscal Year 2000 (Oct. 5. 1999), 2 *Pub. Papers of Pres. William J. Clinton* 1685, 1688 (1999) ("A number of other provisions of this bill raise serious constitutional concerns. Because the President is the Commander in Chief and the Chief Executive under the Constitution, the Congress may not interfere with the President's duty to protect classified and other sensitive national security information or his responsibility to control the disclosure of such information by subordinate officials of the executive branch (sections 1042, 3150, and 3164). . . . To the extent that these provisions conflict with my constitutional responsibilities in these areas, I will construe them where possible to avoid such conflicts, and where it is impossible to do so, I will treat them as advisory. I hereby direct all executive branch officials to do likewise."); Statement on Signing the National Defense Authorization Act for Fiscal Year 1998 (Nov. 18, 1997), 2 *Pub. Papers of Pres. William J. Clinton* 1611, 1612 (1997) ("Because of the President's constitutional role, the Congress may not prevent the President from controlling the disclosure of classified and other sensitive information by subordinate officials of the executive branch.").

### E. Foreign Affairs and Power as Commander in Chief

President Bush also has used signing statements to safeguard the President's well-established role in the Nation's foreign affairs and the President's wartime power. These signing statements also are in keeping with the practice of his predecessors. *See, e.g.*, Louis Fisher, *Constitutional Conflicts Between Congress and the President* 134 (4th rev. ed. 1997) (noting that President Wilson expressed an intention not to enforce a provision on the grounds it was unconstitutional because Congress did not have the authority to direct the President on the conduct

of foreign affairs) (citation omitted); Statement by the President Upon Signing the General Appropriations Act (Sept. 6, 1950), *Pub. Papers of Pres. Harry S. Truman* 616 (1950) ("I do not regard this provision [involving loans to Spain] as a directive, which would be unconstitutional, but instead as an authorization, in addition to the authority already in existence under which loans to Spain may be made."); Statement on Signing the Military Appropriations Authorization Bill (Nov. 17, 1971), *Pub. Papers of Pres. Richard M. Nixon* 1114, 1114 (1971) (Mansfield Amendment setting a final date for the withdrawal of U.S. Forces from Indochina was "without binding force or effect"); Department of State, International Communication Agency, and Board for International Broadcasting Appropriations Bill—Statement on Signing H.R. 3363 Into Law (Aug. 15, 1979), 2 *Pub. Papers of Pres. Jimmy Carter* 1434, 1434 (1979) ("Congress cannot mandate the establishment of consular relations at a time and place unacceptable to the President").

Some have argued that President Bush has increased the use of presidential signing statements, but any such increase must be viewed in light of current events and the legislative response to those events. While President Bush has issued numerous signing statements involving foreign affairs and his power as Commander in Chief, the significance of legislation affecting national security has increased markedly since the September 11th attacks and Congress's authorization of the use of military force against the terrorists who perpetrated those attacks. Even before the War on Terror, President Clinton issued many such statements. *See, e.g.*, Statement on Signing the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999 (Oct. 23, 1998), 2 *Pub. Papers of Pres. William J. Clinton* 1843, 1847 (1998) ("Section 610 of the Commerce/Justice/ State appropriations provision prohibits the use of appropriated funds for the participation of U.S. armed forces in a U.N. peacekeeping mission under foreign command unless the President's military advisers have recommended such involvement and the President has submitted such recommendations to the Congress . . . [which] unconstitutionally constrain[s] my diplomatic authority and my authority as Commander in Chief, and I will apply them consistent with my constitutional responsibilities."); Statement on Signing the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (Mar. 12, 1996), 1 *Pub. Papers of Pres. William J. Clinton* 433, 434 (1996) ("Consistent with the Constitution, I interpret the Act as not derogating from the President's authority to conduct foreign policy. . . . While I support the underlying intent of these sections, the President's constitutional authority over foreign policy necessarily entails discretion over these matters. Accordingly, I will construe these provisions to [b]e precatory.").

### F. Unitary Executive

Some critics have focused in particular on signing statements that make reference to the President's authority to supervise the "unitary executive." Although the phrase has been used by critics to mean many things in recent months, at bottom, the core idea of a "unitary executive" is that, because "[t]he executive power shall be vested in [the] President" under the Constitution, U.S. Const. art. II, § 1, the President has broad authority to direct the exercise of discretion by officials within the Executive Branch. As several scholars concluded after an exhaustive survey of historical practice, "each of the first thirty-two presidents—from George Washington up through Franklin D. Roosevelt—believed in a unitary executive" and "every president between 1945 and 2004 defended the unitariness of the executive branch." Christopher S. Yoo, Steven G. Calabresi & Anthony J. Colangelo, *The Unitary Executive in the Modern Era, 1945–2004*, 90 Iowa L. Rev. 601, 608, 730 (2005).

President Bush's statements that he intends to construe particular statutory provisions consistent with his constitutional obligation to "supervise the unitary Executive Branch" are indistinguishable from similar statements made by past Presidents of both parties. For example, President Reagan in 1987 issued the following signing statement:

> I wish to make clear my understanding that sections 252(a)(1) and (2) of the amended Act—which direct the President to issue an order "in strict accordance" with the report submitted by the Office of Management and Budget—do not preclude me or future Presidents from exercising our authority to supervise the execution of the law by overseeing and directing the Director of OMB in the preparation and, if necessary, revision of his reports. If this provision were interpreted otherwise so as to require the President to follow the orders of a subordinate, it would plainly constitute an unconstitutional infringement of the *President's authority as head of a unitary Executive branch*.

Statement by President Ronald Reagan upon Signing H.J. Res. 324 (Sept. 29, 1987), 2 *Pub. Papers of Pres. Ronald Reagan* 1096, 1097 (1987) (emphasis added). *See also, e.g.*, Statement by President William J. Clinton Upon Signing the Balanced Budget Act of 1997 (Aug. 5, 1997), 2 *Pub. Papers of Pres. William J. Clinton* 1053, 1054 (1997) ("Section 4422 of the bill purports to require the Secretary of Health and Human Services to develop a legislative proposal . . . . I will construe this provision in light of my constitutional duty and authority to recommend to the Congress such legislative measures as I judge necessary and expedient, and *to supervise and guide my subordinates, including the review of their proposed communications to the Congress*.") (emphasis added); Statement

by President William J. Clinton Upon Signing the Treasury and General Government Appropriations Act (Oct. 10, 1997), 2 *Pub. Papers of Pres. William J. Clinton* 1339, 1340 (1997) ("Any broader interpretation of the provision that would apply to 'nonwhistleblowers' *would raise substantial constitutional concerns in depriving the President and his department and agency heads of their ability to supervise and control the operations and communications of the executive branch*. I do not interpret this provision to detract from my constitutional authority in this way.") (emphasis added); Statement by President George Bush upon Signing H.R. 3792 (Feb. 16, 1990), 1 *Pub. Papers of Pres. George Bush* 239, 241 (1990) ("I shall interpret these provisions consistent with my authority *as head of the unitary executive branch*.") (emphasis added); Statement by President George Bush upon Signing H.R. 5019 (Nov. 5, 1990), 2 *Pub. Papers of Pres. George Bush* 1561, 1562 (1990) ("This provision must be interpreted in light of my constitutional responsibility, *as head of the unitary executive branch*, to supervise my subordinates.") (emphasis added).

Similarly, during the Carter Administration, the Justice Department published a legal opinion stating that "[t]he ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the constitution evidently contemplated in vesting general executive power in the President alone." *Administrative Procedure—Rulemaking—Department of the Interior—Ex Parte Communications—Consultation with the Council of Economic Advisors—Surface Mining Control and Reclamation Act (30 U.S.C. § 1201 et seq.)*, 3 Op. O.L.C. 21, 23 (1979) (quoting *Myers v. United States*, 272 U.S. 52, 135 (1926)). The specific phrasing used in these signing statements is not unique, and indeed employs language that was already well settled by the mid-nineteenth century. For example, Attorney General Cushing wrote in an 1854 opinion that the "settled constitutional theory" was that "executive discretion exists, and that judgment is continually to be exercised, yet required unity of executive action, and, of course, unity of executive decision." *Offices and Duties of Attorney General*, 6 Op. Att'y Gen. 326 (1854). These statements explaining the President's authority to supervise the Executive Branch in the execution of the law are uncontroversial and consistent with well-established law. The Supreme Court specifically has stated that the President has the power to "supervise and guide [Executive officers'] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone," *Myers v. United States*, 272 U.S. 52, 135 (1926). More recently, the Court has explained that "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Bowsher v. Synar*, 478 U.S. 714, 733 (1986).

## III.

Until recently, every scholarly discussion of signing statements of which we are aware simply counted the number of bills about which a President had made constitutional signing statements. Under that traditional measure, the number of signing statements President Bush has issued is, as I have just explained, comparable to the number issued by Presidents Reagan, George H.W. Bush, and Clinton.

Recently, persons critical of the President's use of signing statements have adopted the novel measure of counting the number of *individual provisions* referenced in signing statements. We believe that is a misleading statistic, because President Bush's signing statements tend to be more specific in identifying provisions than his predecessors' signing statements. President Clinton, for example, routinely referred in signing statements to "several provisions" or "a number of provisions" that raised constitutional concerns without enumerating the particular provisions in question. *See, e.g.*, Statement on Signing the Consolidated Appropriations Act, FY 2001 (Dec. 21, 2000), 3 *Pub. Papers of Pres. William J. Clinton* 2770, 2776, 2777 (2000–2001) ("There are *provisions* in the Act that purport to condition my authority or that of certain officers to use funds appropriated by the Act on the approval of congressional committees. My Administration will interpret *such provisions* to require notification only, since any other interpretation would contradict the Supreme Court ruling in *INS v. Chadha*."; "*Several provisions* of the Act also raise concerns under the Recommendations Clause. These provisions purport to require a Cabinet Secretary or other Administration official to make recommendations to Congress on changes in law. To the extent that those provisions would require Administration officials to provide Congress with policy recommendations or draft legislation, I direct these officials to treat any such requirements as precatory.") (emphases added); Statement on Signing Consolidated Appropriations Legislation for Fiscal Year 2000 (Nov. 29, 1999), 2 *Pub. Papers of Pres. William J. Clinton* 2156, 2160 (1999) ("to the extent *these provisions* could be read to prevent the United States from negotiating with foreign governments about climate change, it would be inconsistent with my constitutional authority"; "This legislation includes *a number of provisions* in the various Acts incorporated in it regarding the conduct of foreign affairs that raise serious constitutional concerns. *These provisions* would direct or burden my negotiations with foreign governments and international organizations, as well as intrude on my ability to maintain the confidentiality of sensitive diplomatic negotiations. Similarly, *some provisions* would constrain my Commander in Chief authority and the exercise of my exclusive authority to receive ambassadors and to conduct diplomacy. *Other provisions* raise concerns under the Appointments and Recommendation Clauses. My Administration's objections to most of *these and other provisions* have been made clear in previous statements of Administration policy and other communications to the Congress. Wherever possible, I will construe *these provisions* to be consistent with my constitutional prerogatives and

responsibilities and where such a construction is not possible, I will treat them as not interfering with those prerogatives and responsibilities.") (emphases added). If, as the CRS and many scholars have indicated, the substance of the President's signing statements is unobjectionable, it is no fault that those statements specifically identify the provisions at issue. Indeed, doing so tends to promote the constitutional dialogue between the branches.

## IV.

The constitutional signing statements discussed here are a small, but central, sampling of the many statements issued by American Presidents. These statements are an established part of the President's responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Members of Congress and the President will occasionally disagree on a constitutional question. This disagreement does not relieve the President of the obligation to interpret and uphold the Constitution, but instead supports the candid public announcement of the President's views.

JOHN P. ELWOOD
*Deputy Assistant Attorney General*
*Office of Legal Counsel*